[Cite as *Estate of Richardson v. Bowling Green State Univ.*, 2010-Ohio-3475.]

# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

ESTATE OF AARON M. RICHARDSON, etc.

   Plaintiff

   v.

BOWLING GREEN STATE UNIVERSITY

   Defendant
   Case No. 2005-10179

Judge Clark B. Weaver Sr.

DECISION

{¶ 1}   Plaintiff brought this action alleging wrongful death and survivorship.   The issues of liability and damages were bifurcated and the case proceeded to trial on the issue of liability.

{¶ 2}   On September 15, 2004, decedent Aaron Richardson was an 18-year-old Bowling Green State University (BGSU) freshman who had aspirations of becoming a non-scholarship "walk-on" defensive back for BGSU's football team.   On that day, Aaron was on the practice field as the 3:00 p.m. practice was set to begin.   It was a hot afternoon with temperatures reaching 85 degrees.   Before the team drills began it was customary for the team to run "gassers," a conditioning exercise in which the players run interval sprints from sideline to sideline.   On that particular day, the walk-ons ran gassers on a separate field from the scholarship players.

{¶ 3}   After participating in gassers, the third-string and walk-on players, including Aaron, moved to an adjacent practice area to begin a stretching regimen. Chris Haneline, a former BGSU player and graduate assistant coach, was assigned to

coach the defensive scout team under the supervision of defensive coordinator, Coach Beckman. Neither Haneline nor Beckman had ever met Aaron prior to that day. According to Haneline, Aaron complained of cramping in his lower legs shortly after the stretching exercises began.

{¶ 4} Although there is some debate about the events that transpired over the next hour and considerable disagreement regarding the time when certain events occurred, the weight of the evidence establishes the following sequence of events.

{¶ 5} Student coach Jeff Runnels attempted to help Aaron alleviate the cramping by holding his feet and gently stretching his calves and hamstrings as Aaron lay on his back. When Aaron continued to complain of cramping, both Haneline and Runnels suggested that he get out of the sun and go inside. Haneline told Aaron that he may not be cut out for football as he felt Aaron must have been out of shape.

{¶ 6} Runnels testified that as Aaron lay on the field, unable to perform the stretching exercises, Beckman yelled at Aaron to "get the fuck off the field!" Haneline, however, did not hear any such comments directed toward Aaron. Aaron left the field under his own power with Runnels following behind him. Haneline stated that when Aaron left the field, he and Runnels were the only ones who knew that Aaron had complained of cramping.

{¶ 7} Gerald Barry, a student assistant assigned to work with the training staff in the women's soccer program, testified that he was in the locker room when Aaron walked in with Runnels. Runnels asked Barry to help Aaron get out of his gear. Aaron sat down on the floor with his back against the lockers and then proceeded to lay on the floor in the prone position as he continued to complain of cramping in his legs. Barry observed that Aaron's pulse was normal but that he was sweating and breathing heavily. Barry attempted to hydrate Aaron with Gatorade but Aaron was not able to drink after the first two sips. At that point, Barry sent Runnels out to the athletic field to retrieve a trainer.

{¶ 8} Barry stated that after Runnels left to get a trainer Aaron complained that he was beginning to experience cramping in his abdomen as well as his legs. Feeling a sense of urgency, Barry used his cellular phone in an attempt to reach Assistant Athletic Trainer Annette Davidson but she did not answer. Barry admitted that he thought about

calling 911 at that moment but that he did not feel he had the authority to do so. The time was approximately 3:15 p.m.

{¶ 9} When Runnels found Davidson to inform her of Aaron's condition it was approximately 3:25 to 3:30 pm. Davidson rushed to the locker room where she found Aaron lying on his back with ice packs under his legs. Aaron appeared anxious and excited but his pulse was normal. Head Athletic Trainer Doug Boersma called Davidson's cellular phone at 3:35 p.m. for an update on Aaron and she relayed his condition to Boersma.

{¶ 10} According to Davidson, Aaron responded appropriately when she asked him if he had eaten that day and whether he had enough to drink. Davidson checked his legs but she could not find any physical signs of cramping. Aaron then grabbed her ankle and exclaimed that he was "cramping all over." Davidson didn't understand why Aaron was complaining of full-body cramping and she made a telephone call to Boersma. The time of the call was 3:40 p.m. Boersma recalled that Davidson told him she was going to call 911 for assistance. Davidson then left Aaron's side to retrieve a blood pressure cuff and some Gatorade.

{¶ 11} Barry and Runnels moved Aaron from the locker room to a less humid area just outside the door. Aaron was weak and unable to walk without assistance. When Davidson returned, Aaron was sitting on the floor with his back against the wall. She was unable to inflate the blood pressure cuff because of a leak. When she checked Aaron's pupils, she found that they were slow to respond and when she checked his pulse she found it to be very slow. Davidson decided it was time to call 911 and she proceeded to the training room to use the telephone.

{¶ 12} Boersma arrived outside the locker room to find Aaron sitting with his back against the wall and his legs straight out in front of him. He leaned over and said "Rough first day?" Aaron responded "Yeah, rough first day."

{¶ 13} As Davidson was on the phone with emergency services, Boersma entered the training room to retrieve Aaron's medical records. Telephone records confirm that Davidson placed the call at 3:42 p.m. Davidson then heard Barry calling for Boersma to return as Aaron had stopped breathing and had no pulse. Boersma rushed back to begin performing CPR as Davidson grabbed the Automatic Electronic

Defibrillator (AED).  In the next few minutes they attempted to revive Aaron.  AED records indicate that the device was activated at 3:44 p.m.  The ambulance arrived at 3:47 p.m., left with Aaron at 3:48 p.m., and arrived at the hospital at 4:05 p.m.  Aaron never regained consciousness and he was pronounced dead at 5:35 p.m.

{¶ 14} Aaron's mother, Alice Ashburn, testified that Aaron was a star athlete in high school and that he played football and ran track.  According to Ashburn, Aaron had passed numerous, mandatory physical examinations in order to play on his high school sports teams.  Aaron's high school track and assistant football coach, Shane Burrows, testified that Aaron was an outstanding track athlete who had achieved a record number of points as a high school sprinter.  Burrows recalled that Aaron had a tremendous work ethic on the football field and that the coaches could never work Aaron hard enough to tire him out.  In his senior year Aaron was named to the "All Ohio Track Team."

{¶ 15} Aaron's brother, Jaron, was diagnosed with sickle cell disease at birth. When Aaron was tested for the disease at the age of seven it was determined that Aaron had sickle cell trait but not sickle cell disease.  The medical experts who testified in this case agree that sickle cell is a genetic abnormality affecting the blood.  The red blood cells in sickle cell patients experience a diminished capacity to carry oxygen.  A crisis occurs when the red blood cells become hypoxic and collapse into a sickle shape. The deformation of the red blood cells causes the blood vessels to become clogged. The pressure in the blood vessels causes significant pain in the affected area and the restricted blood flow can result in ischemic injuries to muscle tissue and vital organs.

{¶ 16} A patient with sickle cell disease inherits the abnormal gene from both parents whereas a sickle cell trait patient inherits the gene from just one parent. Patients with sickle cell disease experience sickling and related physiological problems throughout their lives and they require lifetime treatment.  Sickle cell trait patients rarely experience adverse effects from the disease and may never require treatment. Indeed, while Jaron had endured more than 300 sickle cell crises in his 19 years, Aaron had never experienced a single such crisis.

{¶ 17} When Aaron was a child, his family physician, Dr. Richard Keller detected a slight cardiac murmur during a routine medical examination.  Keller testified that he

was not concerned about the condition and that it was later determined through testing that Aaron's heart function was normal.

{¶ 18} Plaintiff's theory of liability is that when Aaron first complained of cramping while stretching on the practice field, the standard of care required an immediate evaluation of his condition by a qualified athletic trainer. Plaintiff alleges that a competent evaluation at or about 3:00 p.m. would have alerted the training staff to the possibility that Aaron's condition was more serious than simple exertional cramping. Plaintiff posits that a call for emergency medical attention made at or near that time would have assured that Aaron would receive life-saving treatment.

{¶ 19} Given the proximity of the practice field to both the local emergency squad and an emergent care facility, it is reasonable to conclude that a squad would have arrived at the field within five or ten minutes of the emergency call and that Aaron would have arrived at Wood County Hospital for life-saving care within 20 to 25 minutes of the call. Indeed, the evidence is that the local emergency squad arrived just five minutes after Davidson dialed 911 and that Aaron arrived at the hospital 23 minutes after the call. The time of cardiac arrest is fixed by the testimony and other evidence at approximately 3:43 p.m., which is when Aaron stopped breathing and lost consciousness.

{¶ 20} In further support of plaintiff's theory, plaintiff called to testify Mark Merrick, a certified athletic trainer and Ohio State University professor of exercise pathophysiology. Merrick testified that Aaron's complaints of cramping in his lower legs should have been reported to a certified athletic trainer and that an immediate examination should have been performed to determine whether Aaron was suffering from a more serious condition. According to Merrick, palpating the affected area for signs of knotted muscle tissue would have revealed to a qualified trainer that Aaron's lower leg pain was of a different etiology. He opined that BGSU did not meet the standard of care in the field of athletic training by permitting Aaron to be sent off the field without first undergoing such an examination.

{¶ 21} On cross-examination, however, Merick admitted that Aaron's ability to walk off the field under his own power was a counter indication of anything more serious than simple exertional cramping.

{¶ 22} With respect to Aaron's subsequent care, Merrick opined that when Aaron became weak and complained that he was cramping all over, Barry should have realized that Aaron was having a sickle cell crisis and immediately called for emergency medical assistance. Merrick testified that the call should have been made at or about 3:10 p.m. to 3:13 p.m. On cross-examination, Merrick admitted that he relied upon Barry's observations in forming his opinion, and that Barry's observations conflicted with those reported by Davidson. Merrick also confirmed that he had placed some of the responsibility for this tragedy upon Aaron himself for neglecting to inform defendant's training staff that he had been diagnosed with sickle cell trait. According to Merrick, Aaron should have disclosed the condition when the specific inquiry was made of him in the medical questionnaire.

{¶ 23} Defendant contends that given Aaron's relatively minor on-the-field symptoms and his ability to walk off the field under his own power, trainers were under no obligation to evaluate him while he was still on the practice field. In support of this contention, defendant presented the testimony of Michigan State University Head Athletic Trainer, Stephen Monroe. Monroe is a past president of the National Association of Athletic Trainers and he has worked at MSU for the past 24 years, primarily with the football program. Monroe testified that the recommended course of treatment for a football player who complains of cramping is to hydrate the player, move him out of the sun, and to allow him to rest while under the observation of either an assistant trainer or student assistant. During this period, the player's recent food and fluid intake should be ascertained and that information along with any other relevant findings, should be reported to the head trainer no later than 30 minutes after the player is first evaluated.

{¶ 24} It was Monroe's opinion that given the relatively common complaints of localized cramping experienced by Aaron, defendant's training staff would have had no reason to suspect that Aaron was experiencing a more serious condition such as heat exhaustion, sickling, or rhabdomyolysis. Similarly, the fact that Aaron was able to walk off the field under his own power convinced Monroe that defendant's training staff had no duty to evaluate Aaron before he was sent to the locker room. In Monroe's opinion,

the failure of the coaching staff to notify the training staff of Aaron's cramping would have not made any difference in the course of events.

{¶ 25} With respect to Aaron's care after he reached the locker room, Monroe noted that Barry took a history from Aaron, checked his pulse and offered him fluids. Based upon his review of the witness statements and depositions, Monroe concluded that Barry had no duty to call for emergency medical assistance. Monroe agreed that if Aaron had demonstrated a change in his mental status, the standard of care applied to an athletic trainer would have required an immediate call for emergency medical assistance. On cross-examination, Monroe also admitted that if Aaron exhibited full-body cramping while being attended to by Barry then Barry should have called for emergency help.

{¶ 26} Davidson testified that, in 2004, football was her primary sport and that she attended all practices and contests. Davidson had first met Aaron on the previous day when she interviewed him, as she did with all walk-on players, to review his medical information. According to Davidson, Aaron appeared to be in excellent physical condition. Davidson remembered congratulating Aaron on the relatively clean family medical history reflected in the medical forms Aaron had completed. Aaron agreed that he was very fortunate. However, Aaron neglected to tell Davidson that he had been diagnosed with sickle cell trait which fact he had omitted from the information on the medical questionnaire that he had completed, even though the form contains a specific inquiry about sickle cell trait.

{¶ 27} Based upon the evidence presented in this case, the court finds that the standard of care did not require defendant's training staff to perform an examination of Aaron before he left the field. The court is persuaded by Monroe's testimony that cramping in the lower legs is a common condition among practicing athletes and that an athlete who complains of calf pain after having run pre-practice gassers, need not be evaluated by training staff. Moreover, as noted above, defendant's training staff could not have had knowledge that Aaron had sickle cell trait or even that he suffered from any other medical condition that would have put him at risk of a more serious problem. In short, while it may have been prudent for the coaches to inform the training staff of Aaron's complaints before ordering him off the field, plaintiff has failed to prove either

that the standard of care required an immediate, on-the-field evaluation by defendant's training staff or that such an evaluation would have resulted in a different course of action.

{¶ 28} Nonetheless, Merrick and Monroe agreed that the standard of care requires training personnel to summon emergency medical assistance when an athlete exhibits either full-body cramping or an altered mental state. Both Boersma and Davidson acknowledged as much in their own testimony. The evidence leaves no doubt that at some point prior to cardiac arrest, Aaron experienced both of these warning signs. The questions for the court are when any such signs manifested and whether a call to 911 at such time would have made a difference in the outcome.

{¶ 29} Plaintiff claims that Aaron complained of whole-body cramping at 3:15 p.m., while he was being attended to by Barry and Runnels in the locker room. Plaintiff claims that Aaron could still have been saved had emergency medical assistance been summoned at that time. Defendant believes that its training staff responded appropriately to Aaron's worsening condition and that emergency services were requested as soon as the need for such services was reasonably discernable. In the alternative, defendant argues that even if defendant's training staff had earlier summoned emergency medical assistance, such intervention would not have changed the outcome.

{¶ 30} Andrew Campbell, M.D. is employed in the department of pediatric hematology and oncology at the University of Michigan Hospital; he is licensed to practice medicine in Michigan. Dr. Campbell is board-certified in pediatric hematology and oncology and he testified that his work with sickle cell anemia patients makes up approximately 85 percent of his clinical practice.

{¶ 31} Dr. Campbell was contacted by defendant to testify as an expert in this matter. He reviewed the autopsy report, the Wood County Memorial Hospital medical records, various witness depositions and statements, and the reports submitted by the other experts involved in this litigation.

{¶ 32} Dr. Campbell does not believe it is possible to identify the point in time after Aaron began cramping when Aaron's life could no longer be saved. Campbell did opine that even if resuscitation efforts were started 10 to 15 minutes prior to Aaron's

cardiac arrest, it is unlikely that Aaron would have survived. Dr. Campbell's opinion was based upon two important factors: 1) Aaron's extremely low hemoglobin level, measured at 8.4 (normal is 14-16); and 2) Aaron's extremely high sodium level, measured at 184 parts per liter (normal is 131-143). Given these measured levels, Dr. Campbell opined that in the 10 to 15-minute time frame prior to arrest, Aaron's condition had deteriorated past the point where he could be saved. Indeed, Dr. Campbell related a 75 percent mortality rate for patients whose serum sodium level reaches 160.

{¶ 33} Dr. Campbell concluded that Aaron was suffering from severe acidosis shortly before his death, and that the acidosis led to a condition known as Rhabdomyolysis, which is a catastrophic deterioration of muscle cells generally associated with severe dehydration. According to Dr. Campbell, Rhabdomyolysis is a common component of death in patients who experience a sickle cell crisis.

{¶ 34} Although Dr. Campbell was aware that Aaron's autopsy revealed sickling, he concluded that a sickle cell crisis was not the cause of Aaron's death. In fact, Dr. Campbell did not believe Aaron experienced a sickle cell crisis at all. Rather, he believed that Aaron's death was the result of exertional heat exhaustion which led to both acidosis and Rhabdomyolysis which, in turn, led to cardiopulmonary collapse. Dr. Campbell explained that there is a "direct relationship" between dehydration and sickling and that Aaron's sickling likely occurred because of dehydration.

{¶ 35} Dr. Campbell opined that Aaron would not have known his leg pain was from sickling because he had never experienced sickling during his lifetime. Dr. Campbell described an exertional sickling crisis as a "precipitous event" associated with a high rate of mortality, particularly when accompanied by acidosis and Rhabdomyolysis. He stated that most of the scientific knowledge about the physiology of a sickle cell crisis in trait patients is anecdotal, and that the medical community has a "poor understanding at this point."

{¶ 36} Plaintiff presented the expert medical testimony of Dr. Thamal Schaban, who is licensed to practice medicine in Ohio and is board-certified in internal medicine, pulmonary medicine, intensive care and sleep medicine. Dr. Schaban has had three and one-half years of training in emergency medicine and he considers himself a

specialist in resuscitation. He stated that he had never before testified as an expert witness in a medical case.

{¶ 37} According to Dr. Schaban, the primary resuscitation technique for a patient in sickle cell crisis is to provide hydration and oxygenation; pain therapy and a blood transfusion are secondary treatments. Dr. Schaban opined that the cause of Aaron's death was a sickle cell crisis induced by exercise and dehydration. According to Dr. Schaban, sickling of red blood cells causes patients to experience immediate pain, but that with appropriate and timely resuscitation sickling does not always result in a crisis. Indeed, Dr. Schaban opined that Aaron probably would have survived had intravenous fluid been administered to Aaron just 10 or 15 minutes prior to cardiopulmonary collapse. Once Aaron's pulse was lost, however, Dr. Schaban estimated that Aaron's chances for survival fell to approximately 20-25 percent.

{¶ 38} Dr. Schaban testified on cross-examination that given the exact time when Aaron experienced cardiopulmonary collapse, the time it took emergency personnel to arrive at the scene after being called, and the fact that it would likely have taken several minutes for an emergency medical technician to establish an intravenous line, emergency services needed to be summoned by 3:25 p.m. in order for Aaron to be saved.

{¶ 39} Dr. Schaban acknowledged that he is not a hematologist; that he has treated only two patients with sickle cell trait in his career; and that he has never been called upon to resuscitate a sickle cell trait patient in crisis. He is not aware of any studies regarding survival rates for sickle cell trait patients in an exertional crisis and thus, his opinion on the subject is based in large part upon his review of several case studies. In each of the cases he reviewed, the patient eventually died.

{¶ 40} Plaintiff also produced the expert testimony of Michael Levien, M.D., a pediatric hematologist and staff oncologist at the Cleveland Clinic. Dr. Levien is board-certified in general pediatrics and he has been twice certified in the "sub-board" of pediatric hematology/oncology. Dr. Levien testified that Aaron's death was due to a cardiopulmonary crisis secondary to a sickle cell crisis. Dr. Levien has treated Aaron's brother Jaron for 20 years relative to his sickle cell disease. According to Dr. Levien, Jaron has experienced a variety of sickle cell crises over the years including crises

originating in the bone, the chest and lungs, and other vital organs. Not one of the crises experienced by Jaron was caused by exertion as was the case with Aaron.

{¶ 41} Although Dr. Levien has resuscitated countless sickle cell disease patients in crisis, he acknowledged that he has never performed such life-saving procedures on a sickle cell trait patient who was experiencing exertional sickling. According to Dr. Levien, there is insufficient scientific data available to establish survival rates for such patients. Nevertheless, Dr. Levien opined that had efforts to resuscitate Aaron begun as little as 10 to 15 minutes prior to cardiac arrest, he probably would have survived.

{¶ 42} Dr. Levien did not accept the sodium levels measured in the samples taken at Wood County Hospital. He believed that measured levels did not accurately reflect Aaron's condition when he arrived at the hospital given the intravenous treatments administered to Aaron in connection with resuscitation. Consequently, Dr. Levien did not agree that Aaron was hypernatremic. Dr. Levien was similarly unconvinced that Rhabdomyolysis played any part in Aaron's death.

{¶ 43} Defendant's expert, Dr. Steven Cantrill is a semi-retired emergency room physician who is board-certified in emergency medicine. Dr. Cantrill described Aaron's initial complaints of cramping as "relatively mild" and "atypical" of a patient who would require life-saving treatment just 20 to 25 minutes later. Dr. Cantrill considered hypernatremia to be the most significant factor contributing to Aaron's death. He repeatedly testified that Aaron's sodium level was "astoundingly high" and that such an elevated level of serum sodium was "inconsistent with life." Indeed, the measured level of sodium in Aaron's blood plasma convinced Dr. Cantrill that Aaron had been dehydrated for a lengthy period of time prior to the practice, perhaps hours or even days prior. Dr. Cantrill acknowledged that Aaron received intravenous fluids at the hospital, but he opined that such treatment could not have resulted in the extraordinarily high level of sodium in Aaron's blood. Given the Wood County Hospital lab results, Dr. Cantrill opined that beginning resuscitation efforts 15 minutes earlier would have made no difference in the outcome. Dr. Cantrill did not feel that the available data was sufficient for him to determine whether the sickling noted in the autopsy report began prior to Aaron's death or postmortem.

{¶ 44} Based upon the lay and expert testimony presented in this case, the court finds that defendant did not breach the standard of care owed to plaintiff when it sent Aaron off the field accompanied only by a student athletic trainer. The weight of the testimony does not convince the court that the standard of care in the field of athletic training requires an on-the-field evaluation by a certified athletic trainer under the circumstances presented herein. Aaron complained of minor leg cramps after a relatively short period of exertion that occurred at the start of practice. The question whether the standard of care would have required greater vigilance on the part of BGSU's training staff had they been aware of Aaron's particular medical condition prior to the start of practice is a more difficult question for the court but not the relevant inquiry in this case.

{¶ 45} Plaintiff's alternative theory is that BGSU's training staff had a duty to seek emergency medical intervention much earlier in the course of events. As noted above, the consensus among the certified athletic trainers who testified in this case is, that once a player either develops full-body cramping or demonstrates an altered mental state, emergency medical services should be summoned regardless of what the suspected cause of the player's medical condition might be.

{¶ 46} The evidence establishes that relevant, reliable survival rates for patients with Aaron's rare condition are simply not yet available to the medical community. Drs. Levien and Schaban opined that Aaron could have been resuscitated had such efforts been initiated 10 to 15 minutes earlier. Conversely, Drs. Cantrill and Campbell opined that resuscitation efforts undertaken at the earlier time would have been futile. Indeed, the court found the testimony of Dr. Cantrill to be the most persuasive in that he was convinced that Aaron's dehydration was such that his chances for survival were minimal.

{¶ 47} Although plaintiff provided an adequate foundation for the court to admit the testimony of its experts on the issue of survivability, the weight of the evidence establishes that the dramatic downward spiral in Aaron's condition from the point in time when he first experienced whole-body cramping to the time of his death was so precipitous that Aaron's survival was unlikely. While the evidence does not permit the court to pinpoint the moment in time when Aaron's life was irretrievably lost, the

evidence persuades the court that such a point in time was much earlier in the course of events than plaintiff suggests. Plaintiff's expert, Dr. Levien, explained that it is more difficult for sickle cell trait patients to recover from a sickle cell crisis than it is for sickle cell disease patients inasmuch as patients who have the disease have become acclimated to a chronically low hemoglobin level whereas trait patients generally have normal hemoglobin. In other words, sickle cell disease patients have adapted to sickling and can recover more quickly and successfully. Additionally, according to Dr. Campbell, the medical evidence suggests that sickle cell patients who experience a crisis due to exertion have a lower survival rate than those whose sickling can be attributed to other causes. As noted by several of the medical experts who testified in this case, the survival rate for sickle cell trait patients who experience an exertional sickling crisis, such as Aaron, is unknown. In a negligence action, plaintiff has the burden of establishing the essential element of proximate cause. See *Mussivand v. David* (1989), 45 Ohio St.3d 314,318. Plaintiff has not met that burden.[1] In the alternative, even if the court were to conclude that the standard of care required defendant's staff to make the call to 911 as early as 3:15 p.m., when Barry allegedly observed Aaron in a full-body cramp, the weight of the evidence does not convince the court that the outcome would have been different.

{¶ 48} For the foregoing reasons, the court finds plaintiff has failed to prove her claim by the preponderance of the evidence and, accordingly, judgment shall be rendered in favor of defendant.

# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

---

[1]Having determined that plaintiff failed to prove her claim by the preponderance of the evidence, BGSU's alternative argument that both the wrongful death and survivorship claims are barred by the release executed by Aaron is not dispositive of any of the claims in this case. Moreover, as the court noted in denying defendant's motion for summary judgment on this issue, such a release would not be binding upon the wrongful death claimants.

ESTATE OF AARON M. RICHARDSON, etc.

    Plaintiff

    v.

BOWLING GREEN STATE UNIVERSITY

    Defendant
    Case No. 2005-10179

Judge Clark B. Weaver Sr.

<u>JUDGMENT ENTRY</u>

This case was tried to the court on the issue of liability. The court has considered the evidence and, for the reasons set forth in the decision filed concurrently herewith, judgment is rendered in favor of defendant. Court costs are assessed against plaintiff. The clerk shall serve upon all parties notice of this judgment and its date of entry upon the journal.

_____
CLARK B. WEAVER SR.
Judge

cc:

Karl W. Schedler
Assistant Attorney General
150 East Gay Street, 18th Floor
Columbus, Ohio 43215-3130

Mary S. O'Neill
Michael T. Murray
111 East Shoreline Drive
P.O. Box 19
Sandusky, Ohio 44871-0019

LP/cmd
Filed June 30, 2010
To S.C. reporter July 22, 2010